Filed 3/7/14  In re S.S. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S.S., a Person Coming Under the Juvenile Court Law. | B248682 c/w B251629<br><br>(Los Angeles County<br>Super. Ct. No. CK80982) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent.<br><br>v.<br><br>DAVID S.,<br><br>Defendant and Respondent;<br><br>S.S.,<br><br>Minor and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Marilyn Mordetzky, Juvenile Court Referee.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Minor and Appellant.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance for Plaintiff and Respondent.

In this consolidated appeal, minor S.S. (born February 2010) appeals from the juvenile court's order granting a petition under Welfare and Institutions Code section 388[1] filed by respondent David S. (father), returning S. to father's custody, and according father family maintenance services. S. also appeals from the order made at an August 26, 2013 section 364 review hearing continuing juvenile court jurisdiction and family maintenance services for an additional six months. We affirm the juvenile court's orders.

## BACKGROUND

**Detention and section 300 petition**

On March 18, 2010, the Los Angeles Department of Children and Family Services (the Department) received a referral alleging that Nancy S. (mother)[2] had suffered a nervous breakdown following S.'s birth and was on a psychiatric hold at the Antelope Valley Hospital in Lancaster. Mother had been diagnosed with schizophrenia several years ago and was a Regional Center client. After mother's hospitalization, S. was cared for by her maternal grandmother.

The maternal grandmother told the Department's social worker that mother came to her home to visit with S. on a daily basis since her release from the hospital and had one overnight visit with the child. During the overnight visit mother "hid the baby" while the maternal grandmother was sleeping, and the maternal grandmother had to look around her apartment to locate the child.

The social worker visited mother's home, where two Regional Center caretakers were present at mother's request to watch over her and to assist her in caring for S. According to the caretakers, mother had been hospitalized twice since S.'s birth. One hospitalization followed an incident in which mother slapped a caregiver, prompting law enforcement intervention. The caretakers reported that father, who was also a Regional Center client, visited with mother and S. on a daily basis, but they did not know where he lived.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Mother is not a party to this appeal.

The Department filed a section 300 petition on S.'s behalf alleging that mother had engaged in a violent altercation during which she slapped an unrelated adult female in S.'s presence, necessitating law enforcement intervention; that mother had mental and emotional problems, including schizophrenia, which rendered her incapable of providing regular care and supervision for S.; that father had failed to provide S. with the necessities of life; and that father had limited ability to provide for S.

Both parents were present and were appointed counsel at the March 25, 2010 detention hearing. Mother's counsel was also appointed as her guardian ad litem. The juvenile court found father to be S.'s presumed father and ordered S. detained from both parents' custody.

**Jurisdiction and disposition**

In April 2010, the Department reported that father was mildly mentally retarded and living in a boarding care facility. He had maintained a relationship with mother and had provided clothes and baby supplies for S. On April 26, 2010, father submitted a waiver of rights admitting the allegations of the section 300 petition. The juvenile court ordered a psychological evaluation pursuant to Evidence Code section 730 for both parents.

In July 2010, the Department filed a supplemental report that included psychological evaluations of mother and father. The psychologist, Dr. Michael P. Ward, found that father had an IQ of 72 and that mother had an IQ of 64. Dr. Ward further found that father's overall functioning was in the mildly retarded range, but that he had some skills above that level. With regard to whether father was capable of eventually caring for S., Dr. Ward opined that father "seems to have a little more ability or potential than [mother]" and that "he might be a little more equipped to eventually have full independent care and custody of his daughter, although only with . . . continued supervision and support." Dr. Ward further opined that father "definitely does have the capacity to learn and so he should be able to benefit from appropriately tailored parenting classes, along with any in-home type supportive services regarding the proper care of a child."

The juvenile court ordered both parents to attend interactive parenting education classes, to participate in Regional Center services, and to take all prescribed medications. The court also ordered mother to participate in mental health treatment and psychiatric monitoring.

In September 2010, the Department reported that both parents had been visiting S. twice a week for a total of three hours. Mother had difficulty staying awake and would often sleep through the visits. Father was present at every monitored visit with mother and remained alert and awake to ensure S.'s safety. The juvenile court accorded father 10 hours of unmonitored visits per week and allowed him to monitor mother's visits.

In October 2010, the Department reported that mother was still having difficulty staying awake during visits. The juvenile court ordered an additional 10 hours per week visitation for father so that he could monitor mother's visits.

**Six-month review proceedings**

In February 2011, the Department reported that S. was developmentally on track and was bonded with her foster family. Both mother and father were participating in interactive parent education provided by the Regional Center, but the parents did not want to have the educators present during S.'s visits.

In May 2011, the Department reported that both parents continued to participate in interactive parent education services provided by the Regional Center but were refusing to allow the instructors to observe their interaction with S. Father's Regional Center parenting instructor submitted a letter on his behalf stating that since November 2010, father had been having unmonitored visits with S. for 10 hours a week and that the visits increased to 20 hours a week in February 2011. The instructor expressed the belief that father "would continue to grow as a parent with continued and consistent visits and parenting support." The instructor qualified his remarks, however, by noting that it was difficult to assess father's parenting skills in day-to-day situations because his visits with S. did not occur daily. The instructor opined that "continued support is needed to provide [father] with the skills for his current situation and his future."

4

In June 2011, father discussed moving into his own apartment because he understood that S. could not live with him in his current group home. In July 2011, the Department received a suspected sexual abuse referral for S. when the foster parents reported redness in the child's vaginal area after S. returned from an extended visit with the parents. The child's condition was subsequently determined to be diaper rash.

**Twelve-month review proceedings**

In November 2011, father was still living in a group home but was saving money to obtain his own apartment. Mother was living in the maternal grandmother's home. Both parents continued to receive Regional Center services but were no longer participating in any parenting program.

S. remained placed with her foster parents, who were interested in pursuing an open adoption so that the child could continue to have a relationship with mother and father. The juvenile court found father to be in compliance with his case plan and mother to be in partial compliance. The court terminated reunification services, ordered an adoption home study, and set a permanency planning hearing.

**Section 366.26 proceedings**

In March 2012, the Department reported that S.'s foster parents had an open referral alleging general neglect and physical and emotional abuse by foster mother of another child that had recently been replaced from their home. In light of the open referral, the foster parents said they wished to pursue legal guardianship over S. and to consider adoption at a later date.

In May 2012, the Department reported that the foster parents were again being investigated for child abuse, this time with respect to S., whom they had allegedly slapped across the face on several occasions. The juvenile court continued the matter pending conclusion of the investigation.

In June 2012, the Department informed father that his visits with S. would be monitored on a going forward basis because he was allowing negative contact between mother and S. Mother was using inappropriate language around S., and allegedly slapping the child. The Department reported that the referral regarding alleged physical

5

abuse of S. by her foster parents had been closed as inconclusive. The Department recommended adoption by the foster parents as the permanent plan for S.

On September 27, 2012, the Department received a referral alleging that S. was a victim of emotional abuse by father. The reporting party alleged that she overheard mother and father arguing while she was on the phone with mother and that the police were contacted. Mother told the social worker that father had always been verbally and physically abusive toward her and that he had hit her when she was pregnant and caused her to lose a tooth. Father denied ever physically abusing mother. He said that the incident during which mother lost a tooth occurred while mother was having a nervous breakdown and was hitting him with her head, which caused her to lose a tooth. The social worker informed father that he could continue to have unmonitored visits with S. but that he would no longer be allowed to monitor mother's visits.

In October 2012, the social worker interviewed mother's Regional Center counselor, Wendy Rasky, regarding domestic violence between the parents. According to Rasky, mother had a history of violence and her disability did not prevent her from becoming aggressive toward others.

In November 2012, the Department reported on an unannounced visit to assess father's home. The social worker found the home to be appropriately furnished with working utilities, and was clean, neat, and devoid of safety hazards. Mother was present in the home but claimed she was there to visit father, not S. The social worker admonished both parents that in light of the domestic violence allegations, they could not visit S. together. S.'s foster mother expressed concerns that father could not protect S. from mother. She reaffirmed her willingness to adopt S.

On December 21, 2012, the Department informed the juvenile court that an adoption home study had been approved for S.'s foster parents and recommended termination of parental rights.

In January 2013, the Department reported that father was employed at Target and was working 25 hours per week. Father wanted S. returned to his care and told the social worker about his childcare plans for S. while he was at work. He planned to put S. in a

daycare center near his apartment when he worked during the week. On weekend days when father had to work his sister would care for S. Father said his goal was to reunite with mother so that S. could live with both of her parents as a family. The Department expressed concern about father's ability to protect S. from mother.

The Department also reported on its investigation into the additional Regional Center services father would be eligible to receive if S. were returned to his care. According to Donna Rentsch (Rentsch), father's Regional Center coordinator, the Regional Center staff would undertake a needs assessment when S. was returned to father to determine the types and quantity of services father would be eligible to receive. Because Regional Center services are voluntary, father would then decide which services he wished to accept. A Regional Center staff member would then visit father's home twice a week to provide the services. Rentsch emphasized that Regional Center staff would visit the home to assist father in caring for S., but not for the purpose of monitoring S.'s safety.

**Section 388 petitions**

On October 26, 2012, father filed a section 388 petition requesting return of S. to his custody or alternatively, reinstatement of family reunification services and unmonitored visits, including overnight visits. In support of his petition, father stated he had complied with his case plan by participating in all Regional Center services and by taking his prescribed medication, and that he had obtained a two-bedroom apartment and lived independently. Father's petition further stated he had substantial unmonitored visits with S., with whom he shared a significant bond, and that he would receive additional Regional Center services when S. was returned to his care.

Mother filed a section 388 petition on December 21, 2012, seeking reinstatement of family reunification services and unmonitored visits with S. In support of her petition, mother provided written confirmation that she had attended 14 parent education and anger management classes, as well as a parenting support group. Mother further stated she had visited S. on a weekly basis for 10 hours.

The juvenile court granted both parents a hearing on their respective section 388 petitions.

**Section 388 hearing**

Father testified at the January 23, 2013 hearing on his section 388 petition that he participated in Regional Center services one day a week for four hours. Father further stated that he would continue to work with the Regional Center and would participate in any additional services he became eligible for once S. was placed in his care. Father described his unmonitored visits, which took place at his apartment once a week for 10 hours. He and S. watched television and ate meals he prepared for them. They also went out to restaurants, visited family members, and went shopping together. Father said he disciplined S. by sending her to her room, but that he did not use any physical discipline. He described the visits he monitored for mother and said that on occasion he had to correct mother when she used inappropriate language in S.'s presence. Father denied ever striking mother, but admitted that he and mother had argued in the past when S. was not present.

Father said he had been living alone in a two-bedroom apartment since July 2012 and that he worked 25 hours per week. While he was at work during the week, father planned to have S. attend a daycare center across the street from his apartment. On weekend days when he had to work, he planned to have his sister care for S.

Rentsch, father's Regional Services coordinator, testified that if S. were placed in father's care, father would be assessed for additional services. Father would then be allocated additional service hours based on his needs. Rentsch further testified that parenting training services provided by the Regional Center were individualized and would take place in the home with S. present.

The Department's social worker testified that the Department was opposed to father's section 388 petition because of concerns regarding the allegations of domestic violence between the parents and father's limited ability to protect S. from mother.

8

Mother testified and admitted arguing with father in the past but denied any incidents of domestic violence. Mother stated she would comply with any visitation order applicable to her if S. were placed in father's care.

On January 31, 2013, the juvenile court further liberalized father's visitation, according him weekend and overnight visits from Friday to Sunday, and calendared another hearing date for its ruling.

**Juvenile court rulings and the instant appeal**

On February 25, 2013, the juvenile court granted father's section 388 petition. The court concluded that father had demonstrated a change in circumstances. The court noted that at the outset of the case, father lived in a group home and was incapable of caring for S., but that since then, he had completed a hands-on parenting class and moved into a stable home that was clean, safe, and appropriate for a child. The juvenile court further found that continued stability was possible because father received supportive services from the Regional Center. Finally the court concluded that S.'s best interests would be served by returning her to the care and custody of her biological father, as long as that situation was safe, and there was no evidence that it was not.

The juvenile court found that father was in full compliance with court orders, that he had established through his unmonitored overnight and weekend visits that he did not present a risk to the child, and that returning S. to his care and custody would not create a substantial detriment to the safety and physical well-being of the child. Over the Department's objection, the juvenile court ordered S. to be released to father. The court further ordered that mother was not to reside in father's home and not to have overnight visits in the home without prior court approval. The juvenile court denied mother's petition seeking unmonitored visitation but allowed father to monitor mother's visits. The court accorded family preservation services for both parents, denied the Department's request for a stay of order, and set the matter for a progress hearing.

The Department filed a writ petition on March 4, 2013, seeking a stay of the juvenile court's home of parent order on the ground that release to father placed S. at serious risk of harm. The petition was supported by a letter brief submitted by counsel

9

representing S. This court initially stayed the release order but subsequently denied the Department's writ petition and lifted the stay on March 26, 2013.

S. and the Department appealed from the order granting father's section 388 petition. The Department subsequently abandoned its appeal.

In August 2013, the Department reported that S. had been continuously residing in father's home since March 28, 2013. Father was receiving both parenting and independent living services through the Regional Center. Mother also participated in some parenting classes. Both parents were participating in family maintenance services. Although mother was not living in father's home, father stated he wanted mother to move in with him once the case was closed. The Department found S. to be well cared for by father and recommended termination of juvenile court jurisdiction.

At the August 26, 2013 review hearing, the juvenile court declined to terminate jurisdiction, and ordered the Department to provide father with an additional six months of family maintenance services. On September 4, 2013, S. appealed from the juvenile court's August 26, 2013 order.

## DISCUSSION

Under section 388, a party may petition the juvenile court to change, modify, or set aside any previously made order. The petitioning party has the burden of showing, by a preponderance of the evidence, (1) there are changed circumstances or new evidence, and (2) the proposed modification is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) The decision to grant the proposed change of order is within the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704.) We will not disturb the juvenile court's order unless it has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. (*Stephanie M., supra*, at p. 318, citing *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421.) When two or more inferences can be made reasonably from the facts, we have no authority to substitute our decision for that of the juvenile court. (*Stephanie M.*, at pp. 318-319.)

S. contends the order granting father's section 388 petition was an abuse of discretion "[b]ecause there was no evidence presented concerning, precisely, what services would be in place for father" upon her return to his custody.[3] There is substantial evidence in the record concerning additional Regional Center services that would be available to father upon S.'s return to his custody. Father's Regional Center coordinator, Rentsch, testified that father would become eligible for additional services once S. was placed with him. Rentsch explained that a Regional Center representative would conduct an in-home assessment to determine the type and quantity of services father would need, including individualized, in-home parent training with S. The Department's dependency investigator, Marion Robinson, testified about her investigation into the services father would receive if S. were returned to him. Robinson confirmed that the Regional Center would complete an assessment to determine whether father needed additional services to help him care for S. and that the Regional Center staff would consult with father about their recommendations to see if he would be willing to accept those services. Father testified that he would participate in all services made available to him that would help him keep S. in his care.

S. claims the juvenile court relied on its personal experience, rather than the evidence presented in court, as the basis for concluding that Regional Center services would be provided to father upon her return to father's custody. She cites the following remarks made by the juvenile court as support for this claim:

> "[Father] has regional services that can be a supportive system that was provided in the 730 report as being important. There is a supportive system. . . . There's a Regional Center than can provide services to this father if the child were returned to his care and custody. . . . Well, I can't think of a more supportive system than Regional Center. I have mother and father both having the services of Regional Center. And it's been my experience that Regional Center will provide those services once a child has been released to that home with services in place."

---

[3]     S. does not challenge the sufficiency of the evidence supporting the juvenile court's finding that father met his burden of establishing a change of circumstances, or that granting father's section 388 petition was in S.'s best interests. Substantial evidence supports these findings, in any event.

S.'s argument is premised on isolated remarks by the juvenile court at the conclusion of the section 388 hearing and ignores the substantial evidence presented at the hearing that father would be eligible for additional Regional Center services if S. were returned to his care, that he would be evaluated to determine the type and quantity of services needed, that those services could include in-home, individualized parent training with S., and that father agreed to participate in all services that would help him to retain custody of S. The record does not support S.'s claim that the juvenile court relied solely on its personal experience as the basis for concluding that Regional Center services would be provided to father after he was granted custody. The record discloses no abuse of discretion by the juvenile court.

The sole basis for S.'s challenge to the juvenile court's August 26, 2013 order declining to terminate jurisdiction and continuing family maintenance is that the order granting father's section 388 petition was in error, and the August 26, 2013 order was accordingly invalid. Because the order granting father's section 388 petition was not erroneous, S. has failed to establish any basis for reversing the juvenile court's August 26, 2013 order.

## DISPOSITION

The February 25, 2013 order granting father's section 388 petition is affirmed, as is the August 26, 2013 order continuing jurisdiction and family maintenance services.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.*
FERNS

_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13